## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

CHAD E. BENNER,                        :
                                       :
     Plaintiff                      :       No. 4:11-CV-00316
                                       :
     v.                             :       (Judge Nealon)
                                       :
MICHAEL J. ASTRUE,                     :
COMMISSIONER OF SOCIAL                 :       **FILED**
SECURITY,                              :       **SCRANTON**
                                       :
     Defendant                      :       MAR 0 6 2012

### MEMORANDUM

Per _____
       DEPUTY CLERK

### BACKGROUND

     The above-captioned action is one seeking review of a decision of the Commissioner of

Social Security ("Commissioner") denying Plaintiff Chad E. Benner's claim for social security

disability insurance benefits and supplemental security income benefits.

     On February 22, 2008, Benner protectively filed[1] an application for disability insurance

benefits and an application for supplemental security income benefits. Tr. 10, 114-118 and 151.[2]

On May 22, 2008, the Bureau of Disability Determination[3] denied Benner's applications. Tr. 69-

78.  On July 6, 2008, Benner requested a hearing before an administrative law judge. Tr. 93-94.

Approximately 14 months later, a hearing commenced on September 4, 2010, before an

administrative law judge. Tr. 20-65.  On October 23, 2009, the administrative law judge issued a

decision denying Benner's applications. Tr. 10-19.  On October 27, 2009, Benner requested that

---

1.   Protective filing is a term for the first time an individual contacts the Social Security
Administration to file a claim for benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is actually signed.

2.   References to "Tr._" are to pages of the administrative record filed by the Defendant as
part of his Answer on April 20, 2011.

3.   The Bureau of Disability Determination is an agency of the Commonwealth of
Pennsylvania which initially evaluates applications for disability insurance benefits and
supplemental security income benefits on behalf of the Social Security Administration.  Tr. 70
and 75.

the Appeals Council review the administrative law judge's decision. Tr. 5-6. After 14 months had passed, the Appeals Council on December 27, 2010, concluded that there was no basis upon which to grant Benner's request for review. Tr. 1-4. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Benner then filed a complaint in this court on February 15, 2011. Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on July 11, 2011, when Benner filed a reply brief.

For the reasons set forth below we will affirm the decision of the Commissioner denying Benner's applications for disability insurance benefits and supplemental security income benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Benner meets the insured status requirements of the Social Security Act through December 31, 2013. Tr. 10 and 12.

Supplemental security income (SSI) is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income.

Benner was born in York, Pennsylvania, on August 2, 1974, and at all times relevant to this matter was considered a "younger individual"[5] whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c). Tr. 114 and 124.

---

4 .   Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

5 .   The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

During Benner's elementary and secondary schooling he attended regular education classes. Tr. 59 and 161.  Benner graduated from high school in 1993 and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 28, 154 and 161.

Benner has past relevant employment[6] as (1) a retail store clerk which was described as unskilled to semi-skilled, medium work by a vocational expert and (2) as a laborer for a company which made business forms which was described as unskilled, medium to heavy work.[7] Tr. 59 and

---

6 .   Past relevant employment in the present case means work performed by Benner during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

7 .   The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

(a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work.*  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work.* Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

(continued...)

3

163-167.  Benner worked as a retail clerk from 1993 to 2007 and thereafter as a laborer until early 2008. Tr. 59 and 156.

Records of the Social Security Administration reveal that Benner had earnings in the years 1987 and 1993 through 2008. Tr. 149.  Benner's highest annual earnings were in 2003 ($18648.54). Id.  Benner's total earnings during 1987 and 1993 through 2008 were $159,439.01. Id.  Benner testified at the administrative hearing held in this case on September 4, 2009, that he has not worked since January 8, 2008. Tr. 29.  He also testified that he is receiving long term disability payments in the amount of $1066.00 per month from an employer sponsored disability insurance policy. Id.; Tr. 248.

Benner claims that he became disabled on January 8, 2008,[8] because of back pain. Tr. 155. He contends he cannot lift more than 10 pounds and sit or stand in one place for more than 20 minutes. Id.  He alleges he suffers from degenerative disc disease of the lumbar spine with radiculopathy. Doc. 9, Plaintiff's Brief, p. 1.  In November, 2008, Benner had back surgery and he claims that his pain is worse since that surgery. Id.

**Standard of Review**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir.

---

7.   (...continued)
     (d) *Heavy work.* Heavy work involves lifting no more
     than 100 pounds at a time with frequent lifting or
     carrying of objects weighing up to 50 pounds. If
     someone can do heavy work, we determine that he or she
     can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

8.   Benner was 33 years old on the alleged disability onset date.

1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the

Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d

Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are

supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247

F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial

evidence, we are bound by those findings, even if we would have decided the factual inquiry

differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary

must be accepted as conclusive by a reviewing court if supported by substantial evidence.");

Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir.

2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

     Substantial evidence "does not mean a large or considerable amount of evidence, but

'rather such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v.

N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198,

200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence

has been described as more than a mere scintilla of evidence but less than a preponderance.

Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be

"something less than the weight of the evidence, and the possibility of drawing two inconsistent

conclusions from the evidence does not prevent an administrative agency's finding from being

supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620

(1966).

     Substantial evidence exists only "in relationship to all the other evidence in the record,"

Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its

weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of

evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails

to resolve a conflict created by the evidence. <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting

certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707.  Therefore, a court

reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v.

Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir.

1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant
> numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and

supplemental security income claims.  <u>See</u> 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; <u>Poulos</u>,

474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a

claimant (1) is engaging in substantial gainful activity,[9] (2) has an impairment that is severe or a combination of impairments that is severe,[10] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[11] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[12]

---

9.    If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

10.    The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b). An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

11.    If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

12.    If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

7

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## MEDICAL RECORDS AND OTHER EVIDENCE

Before we address the administrative law judge's decision and the arguments of counsel, we will briefly review some of Benner's activities and medical records.

The record reveals that Benner lives with his girlfriend and their daughter in his girlfriend's parents' house. Tr. 26-27.  Benner has a driver's license and drives, as he drove to the administrative hearing, more than 30 minutes from his home, with no problem. Tr. 27-28.  Benner can cook, do his laundry, shop for groceries, and assist with the care of his daughter and pets.  Tr. 48-50 and 174-175.  Benner stated that he is able to feed, change, bathe and entertain his daughter. Id.

The first medical record that we encounter is from October 16, 2007. Tr. 337-343.  On that date Benner had an appointment with his treating physician, Susan K. Arisumi, M.D. Id.  Benner complained about "not feeling well for [the] past 2 months" and was having intermittent symptoms of headaches, blurred vision, achiness, fatigue, nausea and back pain. Id.  Dr. Arisumi's impression was that Benner was suffering from lightheadedness of an unclear etiology and offered him diagnostic laboratory tests but he indicated he might "consider [it] for another time." Id.  The

record of this appointment also reveals that Benner was previously diagnosed with a lumbar disc

herniation and bulge on August 11, 2003.[13] Tr. 341.

---

13.   Discogenic disease or degenerative disc disease is disease or degeneration of the
intervertebral discs.  The intervertebral discs, the soft cushions between the 24 bony vertebral
bodies, have a tough outer layer and an inner core composed of a gelatin-like substance, the
nucleus pulposus. The outer layer of an intervertebral disc is called the annulus fibrosus. A bulge
(protrusion) is where the annulus of disc extends beyond the perimeter of the vertebral bodies. A
herniation is where the nucleus pulposus goes beyond its normal boundary into the annulus and
presses the annulus outward. Such bulges(protrusions) and herniations if they contact nerve
tissue can cause pain.  Degenerative disc disease (discogenic disease) has been described as
follows:

> As we age, the water and protein content of the cartilage of the body changes. This
> change results in weaker, more fragile and thin cartilage. Because both the discs
> and the joints that stack the vertebrae (facet joints) are partly composed of
> cartilage, these areas are subject to wear and tear over time (degenerative
> changes). The gradual deterioration of the disc between the vertebrae is referred to
> as degenerative disc disease. . . Wear of the facet cartilage and the bony changes
> of the adjacent joint is referred to as degenerative facet joint disease or
> osteoarthritis of the spine. Trauma injury to the spine can also lead to degenerative
> disc disease.
>
> Degeneration of the disc is medically referred to as spondylosis. Spondylosis can
> be noted on x-ray tests or MRI scanning of the spine as a narrowing of the normal
> "disc space" between the adjacent vertebrae.
>
> Degeneration of the disc tissue makes the disc more susceptible to herniation.
> Degeneration of the disc can cause local pain in the affected area. Any level of the
> spine can be affected by disc degeneration. When disc degeneration affects the
> spine of the neck, it is referred to as cervical disc disease. When the mid-back is
> affected, the condition is referred to as thoracic disc disease. Disc degeneration
> that affects the lumbar spine can cause chronic low back pain (referred to as
> lumbago) or irritation of a spinal nerve to cause pain
> radiating down the leg (sciatica). Lumbago causes pain localized to the low back
> and is common in older people. Degenerative arthritis (osteoarthritis) of the facet
> joints is also a cause of localized lumbar pain that can be detected with plain x-ray
> testing is also
> a cause of localized lumbar pain.  The pain
> from degenerative disc disease of the spine is usually treated conservatively with
> intermittent heat, rest, rehabilitative exercises, and medications to relieve
> pain, muscle spasms, and inflammation.

William C. Shiel, Jr., M.D., Degenerative Disc Disease and Sciatica, MedicineNet.com,
http://www.medicinenet.com/degenerativedisc/page2.htm (Last accessed March 2, 2012).
Degenerative disc disease is considered part of the normal aging process. Id.

On January 4, 2008, Benner had an appointment with Dr. Arisumi at which he complained that his "[l]owerback always hurts" but he was working at "Mooers paper" for 7 months and not taking any pain medications. Tr. 333. Dr. Arisumi's assessment was that Benner suffered from a lumbar disc displacement and the plan was for him to "return to work or school." Tr. 334. She also prescribed the muscle relaxant Cyclobenzaprine,[14] one tablet at bedtime, and Endocet[15] every four to six hours for pain. Id. Dr. Arisumi advised him to call for a follow-up appointment if symptoms worsen or fail to improve. Id.

On January 7, 2008, there were several telephone calls between Dr. Arisumi's office and Benner. Tr. 330-332. During one of the telephone calls Benner indicated he had worked three 12 hour days in a row. Id. Also, Benner indicated he needed a letter from Dr. Arisumi stating that it was "ok to be back to work with heavy equipment and climbing steps." Id. Benner's employer was concerned about Benner taking pain medications and working with heavy equipment, as well as climbing, bending and stooping. Id.

As previously noted Benner's alleged onset date was January 8, 2008. On January 14, 2008, Benner had an appointment with Dr. Arisumi at which he complained that the pain in his back was worse and that the pain medications were not helping. Tr. 326. Dr. Arisumi encouraged him to lose weight,[16] walk more and decrease his tobacco use. Tr. 327. On February 6, 2008, Dr. Arisumi issued a "To whom it may concern" letter in which she stated that Benner could not perform any physical labor. Tr. 353.

At an appointment on February 15, 2008, with Dr. Arisumi, Benner reported that he was out of medications, Percocet had helped, he was currently having a lot of pain, the worst pain was

---

14. Cyclobenzaprine, Drugs.com, http://www.drugs.com/cyclobenzaprine.html (Last accessed March 5, 2012).

15. Endocet is a narcotic pain reliever containing acetaminophen and oxycodone. Endocet, Drugs.com, http://www.drugs.com/endocet.html (Last accessed March 5, 2012).

16. Benner at the administrative hearing testified that he weighed 240 pounds. Tr. 25.

in the lower back, and the pain occasionally radiates to the legs. Tr. 321-322. Dr. Arisumi did note

that Benner was "getting over [a] cold and lung infection." Id.  Dr. Arisumi's assessment was that

Benner suffered from a disc herniation at L4-5 and bulge at L3-L4 level of the lumbar spine. Tr.

322. Dr. Arisumi ordered an MRI of lumbar spine. Id.  Benner's weight at this appointment was

noted to be 254 pounds and his height 5 feet, 11 inches.[17] Tr. 322.

Benner had an MRI of the lumbar spine performed on February 25, 2008. Tr. 398.  The

MRI revealed diffuse disc bulging but no herniations.  The report of this MRI states in pertinent

part as follows:

> At L3-4 there is mild diffuse bulging indenting the
> ventral aspect of the thecal sac[18] and minimally
> impinging upon the L4 nerve roots at their origins
> without posterior deviation.
>
> At L4-5 there is diffuse disc bulging slightly
> asymmetrically prominent on the left with mild
> posterior deviation of the left L5 nerve roots at
> their origin.  There is bilateral lateral recess
> narrowing, left greater than right.
>
> At L5-S1 there is mild diffuse disc bulging, but

---

17.    An individual of such height and weight has a body mass index of 35.4 and is considered
obese. Center for Disease Control and Prevention. Healthy Weight, Adult BMI Calculator,
http://www.cdc.gov/healthyweight/assessing/bmi/a
dult_bmi/english_bmi_calculator/bmi_calculator.html (Last accessed March 5, 2012). "Doctors
often use a formula based on [the person's] height and weight — called the body mass index
(BMI) — to determine if [the person is] obese." Obesity, Definition, Mayo Clinic Staff,
MayoClinic.com, http://www.
Mayoclinic.com/health/obesity/DS00314 (Last accessed March 5, 20121).  Adults with a BMI of
30 or higher are considered obese. Extreme obesity, also called severe obesity or morbid obesity,
occurs when the person has a BMI of 40 or more. With morbid obesity, the person is especially
likely to have serious health problems. Id.

18.    The thecal sac is an elongated tube that extends from the brain to the end of the spine in
which the spinal cord and nerve roots run. It is a covering (membrane) that surrounds the spinal
cord and contains cerebral spinal fluid. Herniated discs which impinge the thecal sac may or may
not cause pain symptoms.

> this impinges primarily upon the abundant epidural fat with no visible impact upon the thecal sac or nerve roots.
>
> There is a superior endplate Schmorl node[19] at L5 anteriorly as before. While there has been mild progression of diffuse disc bulging at L5-S1, compared to the prior exams of 2003 and 2004 this remains noncompressive.

Id. A few weeks later, Benner requested a second opinion, and Dr. Arisumi referred him to a

spine surgeon and physical therapy while also recommending that he exercise more and lose

weight. Tr. 316-317. Dr. Arisumi's assessment was that Benner suffered from a lumbar disc

displacement[20] and emotional stress. Id. Dr. Arisumi prescribed the psychotropic medications

---

19. Schmorl's nodes are upward and downward protrusions of a spinal disk's soft tissue into the bony tissue (vertebral endplates) of an adjacent vertebra. They occur as the spine ages and they may or may not cause symptoms. Schmorl's nodes do not bulge or herniate toward the spinal cord or to the sides (neural foramen) where the nerve roots exit the spine. A Schmorl's node is a type of herniation, that is a vertical herniation, but the typical herniation is where the nucleus pulposus, the jelly-like substance in the middle of the spinal disc, protrudes into the outer layer of the disc (annulus fibrosus) and impinges on a nerve root or the spinal cord. See, generally, Schmorl's Nodes & Running, Livestrong.com, http://www.livestrong.com/article/492012-schmorls-nodes-running/ (Last accessed March 2, 2012); Definition of Schmorl's node, MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey =14007 (Last accessed March 2, 2012); Schmorl nodes, Radiopaedia.org, http://radiopaedia.org/articles/schmorl_nodes. (Last accessed March 2, 2012). A herniation can also refer to the situation where the nucleus pulposus actual extrudes through the annulus when this happens it is usually referred to as an disc extrusion. Disc Extrusion, Laser Spine Institute, http://www.laserspineinstitute.com/back_problems/disc_extrusion/ (Last accessed March 5, 2012).

20. Lumbar disc displacement is a term used to described a disc bulge (protrusion) or herniation.

Fluoxetine and Clonazepim[21] and advised him to schedule an appointment if his symptoms worsened or failed to improve. Id.

On March 31, 2008, Benner had an appointment with Rodwan K. Rajjoub, M.D., a neurosurgeon, located in Williamsport. Tr. 363-365.  Dr. Rajjoub in the history of present illness section of his report of this appointment states as follows: "Mr. Chad Benner is a 33 year old white male, right handed. Complains of pain in the low back and bilateral hips. No leg pain. He reports that this began 6 years ago after bending over and had immediate low back pain.  Treated with physical therapy, ultrasound, heat, electrical stimulation, medications and epidural blocks x 4 at Shamokin.  It is painful to sneeze and/or cough. A bowel movement is not painful. The pain is constant. He cannot sit, lay, or stand very long." Tr. 363.  A physical examination by Dr. Rajjoub revealed, inter alia, that Benner was oriented to person, place and time and his memory was within normal limits for his age. Tr. 364.  Benner had no definite motor weakness, no muscular atrophy, no paravertebral muscle spasm, no ataxia, normal rapid alternating movements, and a steady gait. Id.  Benner had a positive straight leg test bilaterally but a negative Patrick Test, Femoral Nerve Stretch Test, Spurling Sign, Adson Maneuver, Lhermitte's Sign, Tinel's Sign and Phalen's Sign. Id.  Benner had normal biceps, triceps, brachioradial and knee deep tendon reflexes. Id.  Benner's ankle deep tendon reflexes were +1, diminished. Id.  After examining Benner, Dr. Rajjoub concluded that he suffered from axial low back pain syndrome,[22] degenerative lumbar disc disease, bulging disc, and exogenous obesity. Tr. 365.  Dr. Rajjoub noted that Benner's pain was mainly

---

21.   Fluoxetine, Drugs.com, http://www.drugs.com/fluoxetine.html (Last accessed March 5, 2012); Clonazepam, Drugs.com, http://www.drugs.com/clonazepam.html (Last accessed March 5, 2012).

22.   Axial pain is usually described as non-specific, primarily mechanical pain which is sharp, dull, intermittent or constant. It is generally localized and does not travel to other parts of the body.

axial type and mostly related to the degeneration of his discs. Id. Dr. Rajjoub did not feel that Benner was a candidate for surgery but that disc replacement might be an option. Dr. Rajjoub did note that another physician may be willing to perform disc replacement surgery. Id. Dr. Rajjoub, however, scheduled Benner for lumbar epidural steroid blocks. Id. Dr. Rajjoub specifically stated that he did "not recommend diskectomy through the posterior approach at the present time." Id. Dr. Rajjoub scheduled a follow-up appointment in 7 weeks. Id. Dr. Rajjoub administered a lumbar epidural steroid block on April 2, 2008. Tr. 361-362.

On May 2, 2008, Dr. Arisumi completed a functional assessment form on behalf of Benner. Tr. 367-368. Dr. Arisumi noted that she last saw Benner on March 12, 2008, and opined that Benner could only occasionally lift and carry 10 pounds and was only capable of sitting, standing and walking for a total of 6 hours in an 8-hour workday. Id. She further found that he could never bend, kneel, stoop, crouch and climb but that he could occasionally balance. Id. Dr. Arisumi did not indicate when Benner became disabled or how long his disability was expected to last. Id.

On May 6, 2008, based on a referral from Dr. Arisumi, Benner had an appointment with Kevin M. McGaharan, M.D., a physical and rehabilitation medicine specialist, located in Danville, regarding his back pain. Tr. 411-418. Benner told Dr. McGaharan that he had back pain without leg pain for approximately 6 years. Tr. 411. A physical examination revealed that Benner had normal strength in all of his extremities and negative straight leg raise tests.[23] Tr. 412-413. Benner

---

23.    The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc. The patient, either lying or sitting with the knee straight, has his or her leg lifted. The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated
-discs-straight-leg-raise (Last accessed March 5, 2012).

was able to walk on his heels and toes.[24]  Tr. 412.  Benner had normal deep tendon reflexes and his sensation to pinprick was completely intact. Id.  Benner's gait was normal. Tr. 414. Dr. McGaharan reviewed Benner's current radiographs and stated that they revealed "[m]ulti level degenerative disc disease, worse at L4-5. There is bulging at L4-5 which might be compromising the L5 root, which has not been symptomatic for radicular pain." Tr. 415.  Dr. McGaharan concluded that Benner was "primarily" suffering from "mechanical back pain with no radicular complaints today." Id.  Dr. McGaharan noted that Benner was scheduled for  a surgical consultation and in addition to that consultation, he recommend a psychological consultation. Id.

On May 12, 2008, Benner had an appointment with Dr. Arisumi regarding his back pain. Tr. 419-426. The record of this appointment reveals minimal physical examination findings. Id. Dr. Arisumi noted that Benner was "tender to palpation in the lower spine" and that a surgical consultation was scheduled. Id.  Dr. Arisumi on this date had Benner sign a "Medication Usage Agreement for Controlled Substances" which, inter alia, required Benner to only obtain his pain medicines from Dr. Arisumi and agree to random drug testing. Id.

On May 22, 2008, Elizabeth Kamenar, M.D., reviewed Benner's medical records on behalf of the Bureau of Disability Determination and concluded that Benner could engage in a limited range of light work on a full-time basis. Tr. 405-410.  Dr. Kamenar stated that Benner could lift and/or carry 20 pounds occasionally and 10 pounds frequently; he could stand and/or walk for a total of 6 hours in an 8-hour workday and that he could sit for a total of 6 hours in an 8-hour workday; he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl

---

24 .    The heel walk test requires the patient to walk on his heels. The inability to do so suggests L4-5 nerve root irritation. The toe walk test requires the patient to walk on his toes. The inability to do so suggests L5-S1 nerve root irritation. Clinical Examination Terminology, MLS Group of Companies, Inc., https://www.mls-ime.com/articles/GeneralTopics/ Clinical%20Examination%20Terminology.html (Last accessed March 5, 2012).

but never climb ladders, ropes or scaffolds. Tr. 405-406.  Benner had no manipulative, visual or communicative limitations. Tr. 406-407.  With respect to environmental limitations, Benner had to avoid concentrated exposure to vibration and hazards, such as machinery and heights. Tr. 407.

On June 4, 2008, Benner was examined by Dr. Andreychik, M.D., an orthopedic surgeon. Tr. 484-485. The results of a physical examination were as follows: "[A] 33-year old male, well-developed, well-nourished. Back and spine: There is positive pain on palpation in the lower lumbar area.  Negative sciatica notch tenderness.  He did have a full range of motion. Extremities: Peripheral pulses +2. He has full and painless range of motion of the hips, knees and ankles bilaterally.  Neurologically alert and oriented. Motor strength +5 in the bilateral lower extremities. Sensation intact to light touch. Reflexes symmetrical. Heel and toe gait were normal. Negative straight leg raise. Negative Lasegue's." Tr. 484.  Dr. Andreychik also reviewed x-rays and MRI results and stated that there was some disc degeneration and foraminal narrowing at the L4-L5 level of the lumbar spine. Id.  Dr. Andreychik's assessment was that Benner suffered from degenerative disc disease of the lumbar spine and ordered further testing, a diskogram. Tr. 484-485.

On July 2, 2008, a physical examination of Benner completed by Ryan Ness, M.D., a pain medicine specialist revealed essentially normal findings. Tr. 429. Benner had some tenderness in the L4-L5 region of the lumbar spine. Id.  Benner had normal motor strength of the bilateral lower extremities with walking. Id.  Benner had some give-away weakness with motor testing of the individual muscles of the lower extremities.[25] Id.  However, five days later Dr. McGaharan tested the individual muscles of Benner's lower extremities and found that Benner had normal motor strength (5/5). Tr. 435.

---

25.   Give-away weakness can be a sign of either lack of effort or pain.

16

On July 22, 2008, Benner underwent an EMG/Nerve conduction study of the left lower extremity. Tr. 439-442. The electromyogram (EMG) revealed "findings [which were] spotty but . . . in keeping with a left chronic, active L5 radiculopathy." Tr. 439. The nerve conduction study was normal. Id. Also, on July 22, 2008, Benner had a psychological pain evaluation. Tr. 443. That evaluation indicates that Benner stated that none of his medications make him lightheaded or dizzy. Id. It was further stated that Benner "relies a great deal on avoiding activity to manage pain, which likely worsen[s] pain and distress in the long run." Id. The evaluator concluded that Benner suffered from an adjustment disorder, not otherwise specified, and gave Benner a Global Assessment of Functioning (GAF) score of 61-70.[26] Tr. 444.

On August 27, 2008, Dr. Andreychik, after performing a diskogram and reviewing Benner's radiographs, concluded that conservative treatment had failed and that Benner should be scheduled for surgery. Tr. 489. Benner was advised to eliminate his tobacco use prior to surgery. Id.

On September 8, 2008, Benner commenced seeing a new primary care physician, Chris J. Darrup, D.O. Tr. 528-529. At that appointment, Benner denied any weakness, paresthesias or numbness. Tr. 528. Benner had a negative straight leg raise test; he had good range of motion of his neck, shoulders, elbows, wrists, knees, and ankles, and he had a normal toe and heel gait. Id. Similar findings were made by Dr. Darrup on September 29 and October 23, 2008, with the

---

26. The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id.

17

exception that on October 23rd Dr. Darrup noted that Benner had "some loss of lumbar lordosis" and "some mild reproducible pain in his back." Tr. 525-526

Benner underwent an L4-5 laminectomy and posterior spinal fusion with posterior lumbar interbody fusion on November 17, 2008. Tr. 479-480.  Benner reported improvement in his symptoms after the operation. Tr. 480.

On December 12, 2008, Benner reported to Dr. Darrup that his symptoms had worsened, including soreness just around the incision cite, although he admitted that walking improved the swelling and that the numbness and tingling in his legs had improved. Tr. 522.  Dr. Darrup did note a positive straight leg raise test. Id.  Dr. Darrup also noted Benner's tobacco abuse[27] and chronic narcotic use. Id.

At an appointment with Dr. Andreychik on December 17, 2008, Benner reported that he had "a lot of back pain" but "[n]o radicular pain." Tr. 495.  Dr. Andreychik noted that the incision was well-healed. Id.  Dr. Andreychik further stated that "one cage is slightly posterior to its original position . . . causing mild canal impingement but there still should be adequate canal" and that Benner "needs close observation because of the position of this cage." Id.  Dr. Andreychik ordered a brace for Benner. Id.

On January 6, 2009, Benner reported to Dr. Andreychik that he was "doing pretty well." Tr. 293. Benner did report "a lot of axial pain" but Dr. Andreychik stated that this was "not unexpected." Id.  Dr. Benner further noted that the "[c]age appears to be in a decent position" and "[w]e want him to slowly increase his activity." Id.

---

27 .   Individuals who smoke have a higher risk for poor recovery after surgery. John E. Sherman, M.D., Postoperative Care for Spinal Fusion Surgery, http://www.spine-health.com/treatment/spinal-fusion/postoperative-care-spinal-fusion-surgery (Last accessed March 5, 2012).

On January 8, 2009, Benner told Dr. Darrup that he had "no numbness, tingling or paresthesias." Tr. 521. Dr. Darrup did note a positive straight leg raise test which was worse on the right than the left. Id. However, Benner had normal heel and toe gait. Id. Dr. Darrup's diagnosis including chronic back pain and tobacco abuse. Id. Dr. Darrup advised him to quit smoking. Id.

At an appointment with Dr. Darrup on March 2, 2009, Benner stated that his pain was worse then before the surgery and that pain medications were not helping. Tr. 284. Benner denied weakness in his extremities, paresthesias or numbness. Id. The results of a physical examination were essentially normal except for "some paraspinal hypertonicity, as well as loss of lumbar lordosis." Id. Dr. Darrup again recommended smoking cessation. Id. In April, 2009, Dr. Andreychik observed that Benner's pain was not unexpected. Tr. 506.

A physical examination performed on April 23, 2009, by Timothy L. Swift, a certified physician's assistant, was essentially normal. Tr. 302-305. Benner's back was examined and found to have normal curvature and range of motion. Tr. 304. Mr. Swift's findings were reviewed and approved of by Dr. McGaharan. Tr. 305.

On May 4, 2009, Benner reported continued pain to Dr. Darrup. Tr. 285. A physical examination was essentially normal including a negative straight leg raise test. Id. Dr. Darrup did note "loss of lumbar lordosis" and "paraspinal hypertonicity." Id. Dr. Darrup's diagnosis was failed back syndrome and tobacco abuse. Id.

On July 6, 2009, Benner had a follow-up appointment with Dr. Darrup at which he complained of back and leg pain. Tr. 517. Benner told Dr. Darrup that he had a disability form that needed completed and that his surgeon refused to complete the form. Id. The results of a physical examination of Benner were essentially normal, including normal muscle strength bilaterally. Id. The record does not contain a disability form completed by Dr. Darrup.

19

On August 17, 2009, Dr. Andreychik completed a one page form on behalf of Benner in which he stated that Benner's diagnosis was postlaminectomy syndrome, lumbar region (Diagnosis Code 722.83). Tr. 535.  Dr. Andreychik further stated in a conclusory fashion that Benner was "unable to work" from April 23, 2009, through September 3, 2009. Id.  Dr. Andreychik did not give any indication of the physical exertional abilities of Benner. Id.

Benner was then referred to Patrick J. Barry, physical therapist, by Dr. Darrup for a functional capacity evaluation. Tr. 536-553. Mr. Barry did a detailed evaluation of Benner's functional abilities. Id.  Benner had a negative slump test, a negative straight leg raise test, and a negative dural stretch test bilaterally. Tr. 540. Mr. Barry placed Benner in the physical demand category of light work as defined by the U.S. Department of Labor's Dictionary of Occupational Titles. Tr. 536.  Mr. Barry stated that "[i]t is difficult to determine [Benner's] overall level of physical ability and tolerance as there are inconsistencies between his subjective complaints and self perception, the musculoskeletal evaluation, and his actual demonstrated physical abilities." Id. Mr. Barry concluded that putting aside Benner's subjective complaints, Benner's "overall demonstrated level of physical ability should place him in the light category" of work. Id.

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Benner had not engaged in substantial gainful work activity since January 8, 2008, the alleged disability onset date. Tr. 12.

At step two of the sequential evaluation process, the administrative law judge found that Benner had the following severe impairments: "disorders of the back (status post laminectomy and fusion) and obesity[.]" Tr. 12-14.  In light of the GAF score of 61-70 the administrative law judge found that Benner had a non-severe mental impairment. Id.

20

At step three of the sequential evaluation process the administrative law judge found that Benner's impairments did not individually or in combination meet or equal a listed impairment. Tr. 14.

At step four of the sequential evaluation process the administrative law judge found that Benner could not perform his past relevant medium work but that he had the residual functional capacity to perform a limited range of light work. Tr. 14-17.  Specifically, the administrative law judge found that Benner could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for 6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday. Id. Benner had an unlimited ability to push and pull; he could occasionally climb stairs, ramps, balance, stoop, kneel, crouch and crawl; he could never climb ladders, ropes or scaffolds; he had to avoid concentrated exposure to vibration and hazards; and he had no manipulative, visual or communicative limitations. Id.  In setting this residual functional capacity, the administrative law judge relied on the opinions of Dr. Kamenar, the state agency physician, and the opinion of Mr. Barry, the physical therapist, who performed the detailed functional capacity evaluation.

Based on the above residual functional capacity and the testimony of a vocational expert, the administrative law judge at step five of the sequential evaluation process found that Benner could perform unskilled, sedentary work[28] as a surveillance system monitor, call out operator, and information clerk, and that there were a significant number of such jobs in the state and national economies. Tr. 18 and 60-62.

------

28.    The administrative law judge found that Benner could perform light work. If an individual can perform light work, he or she can also perform sedentary work. 20 C.F.R. §§ 404.1567(b) and 416.967(b).  The administrative law judge based on the testimony of a vocational expert identified in his decision sedentary jobs that Benner could perform.  At the hearing the vocational expert identified both light and sedentary jobs that Benner could perform. Tr. 60-62.

The administrative record in this case is 553 pages in length, primarily consisting of medical and vocational records.  Benner makes the following argument: "There is a lack of substantial evidence to support the ALJ's rejection of the opinions of treating physicians."  Benner also argues that the administrative law judge did not appropriately evaluate his credibility.

We have thoroughly reviewed the record in this case and find no merit in Benner's arguments. The administrative law judge did an excellent job of reviewing Benner's vocational history and medical records in her decision. Tr. 10-18.  Furthermore, the brief submitted by the Commissioner thoroughly reviews the medical and vocational evidence in this case. Doc. 10, Brief of Defendant.  Because the administrative law judge adequately reviewed the medical evidence in her decision we will only comment on a few additional items.

Initially, we will note that no treating or examining physician has indicated that Benner suffers from physical or mental functional limitations that would preclude him from engaging in the limited range of light work set by the administrative law judge in her decision for the requisite statutory 12 month period.  In fact, the administrative law judge identified unskilled, sedentary jobs which Benner could perform.  No physician indicated that Benner was incapable of working at that modest level on a full-time basis.

The administrative law judge relied on the opinions of Dr. Kamenar, the state agency physician, and Mr. Barry, the physical therapist. The administrative law judge's reliance on those opinions was appropriate. See Chandler v. Commissioner of Soc. Sec., _ F.3d._, 2011 WL 6062067 at *4 (3d Cir. Dec. 7. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

We are satisfied that the administrative law judge appropriately took into account all of Benner's mental and physical limitations in the residual functional capacity assessment.

22

The administrative law judge stated that Benner's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of light work. Tr. 16. The administrative law judge was not required to accept Benner's claims regarding his physical limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed and heard Benner testify, the administrative law judge is the one best suited to assess the credibility of Benner.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g), affirm the decision of the Commissioner.

An appropriate order will be entered.

Dated: March 6, 2012

_____
United States District Judge

23